## Gensemer, Appellant, v. Gensemer.

Argued September 30, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Cletus C. Kilker*, for appellant.

*H. G. Stutzman*, for appellee.

OPINION BY ERVIN, J., November 9, 1954:

Plaintiff, Harry Z. Gensemer, instituted an action in divorce against Hilda B. Gensemer, defendant. The Master recommended a divorce on the ground of indignities but found that the charge of cruel and barbarous treatment had not been established. The lower court sustained a number of exceptions to the Master's findings and refused the divorce, relying principally upon the ground that the plaintiff was not the injured and innocent spouse. We are in accord with this conclusion. We are not unmindful of the well established principle that the report of the master who saw and heard the witnesses is entitled to the fullest consideration. *Seder v. Seder,* 164 Pa. Superior Ct. 372, 64 A. 2d 668; *Sobotowich v. Sobotowich,* 165 Pa. Superior Ct. 60, 67 A. 2d 637; *Graf v. Graf,* 168 Pa. Superior Ct. 66, 76 A. 2d 659; *Silfies v. Silfies,* 168 Pa. Superior Ct. 421, 79 A. 2d 130; *Van Houten v. Van Houten,* 174 Pa. Superior Ct. 29, 98 A. 2d 397.

However, when the testimony of the plaintiff is contradicted or explained by the defendant, a decree in divorce must be refused. *Gerster v. Gerster,* 166 Pa. Superior Ct. 105, 70 A. 2d 429.

It must appear clearly and indubitably from the testimony that the plaintiff is the injured and innocent spouse before a decree in divorce may be granted on the grounds of indignities to the person. *Othmer v. Othmer,* 158 Pa. Superior Ct. 384, 45 A. 2d 389; *Wilson v. Wilson,* 163 Pa. Superior Ct. 546, 63 A. 2d 104; *Carter v. Carter,* 166 Pa. Superior Ct. 499, 72 A. 2d 621.

The parties were married on December 5, 1915 and had three children, Ella Margaret Gensemer, now married to a member of the Schuylkill County Bar and herself a college graduate; George John Gensemer, a graduate of Gettysburg College and of Jefferson Medi-

cal College, a qualified surgeon; and another son, Harry Z. Gensemer, Jr., married, and a businessman.

The parties lived together as man and wife until December 1941, when the plaintiff left his home and family. He did not support his wife from 1945 until 1952, when he was compelled to do so by a court order.

Colonel Arthur J. May and Mrs. Mabel E. Moyer were the only disinterested witnesses for the plaintiff. Colonel May testified that on one occasion Mrs. Gensemer called on the telephone and complained about her husband doing a lot of drinking and on another occasion she called him and said "I'll tell you, it's too bad he's being involved with some woman around here and she's just putting him in the ground." He also testified that he had no personal knowledge of his drinking excessively. This witness was never in the home where it is alleged he would frequently come in an intoxicated condition. Mrs. Moyer testified that on one occasion she and Mr. and Mrs. Gensemer were in a night club and had had a drink and after coming out and when they were in the car, Mrs. Gensemer took her shoe off and hit Mr. Gensemer on the head with it. On cross-examination this witness was very forgetful and evasive. She couldn't remember whether anything was said before the striking. She couldn't remember whether Mr. Gensemer wanted to stop at a carnival and whether Mrs. Gensemer said, "No, if you don't take me home I'll hit you with my shoe." She admitted that in the taproom a couple of girls came down the steps but she couldn't recall whether Mr. Gensemer said, "Now, this is a bawdy house and that's where boys go up the steps to the girls." And she didn't know whether Mrs. Gensemer was incensed because her husband had taken her to that kind of a place. She also testified that there were occasions when she came downstairs to open her hotel (which at that time was

next door to where the Gensemers were living) and she would see Mr. Gensemer lying on the studio couch off the lobby. She was asked whether he had to stay there because he was drunk and her answer was "No. If he was, why, it wasn't in the morning. I don't know that."

Plaintiff's charges were flatly denied by the defendant with the exception that she admitted charging the plaintiff with infidelity and being frequently intoxicated. Her denials were corroborated by the three children. The plaintiff testified to an incident in 1927 when defendant allegedly threw dishes at him. This the defendant denied and plaintiff offered no other testimony to corroborate his statement. He testified that his wife frequently made accusations against his family. This was denied by her and she is corroborated in her denial by all three of her children. She testified that she never locked him out of the house and in this she was corroborated by her three children. She denied striking him with a lead pipe and throwing his clothes out the window. She was corroborated by her children. The three children testified that the only difficulty between their parents was caused by the father when he came home in an intoxicated condition and started arguments and used abusive language toward his wife. The father frequently questioned the paternity of the two eldest children to their faces and in the presence of the mother. In 1941, the daughter, while walking in the woods with a girl friend, came upon her father and one Evelyn Fegley standing by a car in the woods. When the father returned home he told his wife that he had been in the woods and this woman asked him to help her find her dog. The next day the father called the family together and told them that he did have an affair with this woman two years prior thereto, and that he was attempting to break it off, but that she was hounding him and threatening to kill him if he

did so. He promised that he never would have anything to do with her again. The children corroborated the mother in this. There is testimony that when he left the family he continued the affair with this woman. He was seen in public places and barrooms with her. He was arrested for operating a motor vehicle while under the influence of intoxicating liquor, for which his operating privileges were suspended and this woman was with him at the time of the occurrence. She drove his car and got his mail. It is significant that Evelyn Fegley did not testify and that her absence was not explained. *Dash v. Dash,* 357 Pa. 125, 129, 130, 53 A. 2d 89.

Plaintiff's frequent intoxication, his use of obscene language, his attempts to strike the defendant, necessitating his sons restraining him physically, his frequent denial of the paternity of his two eldest children, his refusal or neglect to support his wife from 1945 to 1952 until compelled to do so by court order, his confessed affair with Evelyn Fegley and the continuation thereof throughout the years, all lead to the conclusion that the plaintiff was not the injured and innocent spouse. *Bredbenner v. Bredbenner,* 175 Pa. Superior Ct. 580, 107 A. 2d 169.

The Master refused to believe the children because he felt that "they were biased and favored their mother." The lower court, on the contrary, did believe them.

We have carefully read the entire record and are in complete accord with the conclusions reached by Judge STAUDENMEIER.

We can see no good reason why these three children should not be believed. Each one had obtained a good education and they apparently were very respectable people in their community. They were children to be

proud of and the father's denial of paternity is not in good taste.

The decree of the court below is affirmed, at the cost of the appellant.